AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
SEP 19 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.
  iPhone Cellphone )
  IMEI: 354853092738735 )
  MEID: 35485309273873 )  '19 MJ 4045

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4, incorporated herein by reference.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952 | Importation of a Controlled Substance and Unlawful acts and Attempt and |
| 21 U.S.C. § 960 | Conspiracy |
| 21 U.S.C. § 963 | |

The application is based on these facts:

See attached Affidavit of HSI Special Agent Whitney Faber

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

HSI Special Agent Whitney Faber
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/19/19

*Judge's signature*

City and state: San Diego, CA

Honorable Judge William V. Gallo
*Printed name and title*

## AFFIDAVIT

I, Whitney Faber, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic devices:

    a. Samsung Model: SM-G960UZPATMB
       IMEI: 354825090659352
       S/N: R28K31FNXKP
       **(Target Device 1)**

    b. iPhone Cellphone
       IMEI: 356759087796380
       ICCID: 89014104270225987584
       **(Target Device 2)**

    c. iPhone Cellphone
       IMEI: 358633090088341
       S/N: F2LX5NTGJWLM
       **(Target Device 3)**; and

    d. iPhone Cellphone
       IMEI: 354853092738735
       MEID: 35485309273873
       **(Target Device 4)**

and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachment B. This search supports an investigation and prosecution of DEYANIRA VERONICA BRANDON, VAPSI MENDOZA, and NORA VILLASENOR for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Devices** were seized from BRANDON, ~~MENDOZA~~ MENDEZ, and VILLASENOR on August 25, 2019, at the time of their arrest at the San Ysidro,

1

California Port of Entry ("POE"), as they attempted to smuggle methamphetamine into the United States. **Target Devices #s 1 and 2** were seized from BRANDON; **Target Device #3** was seized from Mendez; **Target Device #4** was seized from Villasenor. The **Target Devices** are currently in the possession of U.S. Customs and Border Protection at the U.S. Customs and Border Protection Permanent Vault at 9495 Customhouse Plaza in San Diego, CA, 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that a search of the **Target Devices** as described in Attachments A-1, A-2, A-3 an A-4 will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause for the requested warrant.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I am a Special Agent (SA) with ICE-HSI and have been so employed since September 2018. I am currently assigned to the Deputy Special Agent in Charge, San Ysidro Office, Contraband Smuggling Group 5, and my duties include investigating the trafficking of illicit controlled substances; and the importation and distribution of illegal substances. I have training and experience in multiple investigative areas, to include conducting investigations and making arrests based on violations of Title 21, United States Code Sections 952, 960, and 963.

7. I have had approximately 26 weeks of intensive training at the Federal Law Enforcement Training Center at Glynco, Georgia. These 26 weeks were comprised of approximately 12 weeks of the basic criminal investigator training program and approximately 14 weeks of HSI Special Agent Training. I have received training in identifying various controlled substances and conducting Title 21 controlled substances investigations.

8. Prior to my position as an HSI Special Agent, I was employed as a United States Border Patrol (USBP) Agent from March 2003 until September 2018. As a USBP Agent, I conducted many criminal investigations involving violations of federal and state laws including, but not limited to, alien smuggling, narcotics smuggling, kidnapping, extortion and organized criminal activity.

9. I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

   f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

   g. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and

4

contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

  a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;

  b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

  c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

  d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the **Target Device(s)**; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data,

5

personal security keys, contact lists and stored text messages. Some of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. (I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them.) When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

14. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

**FACTS SUPPORTING PROBABLE CAUSE[1]**

---

[1] The facts supporting probable cause in this affidavit do not include information found in any examination of the cellphones. In an abundance of caution, the Government asks the Court not to

6

15. On August 25, 2019, at approximately 1930 hours, DEYANIRA VERONICA BRANDON ("BRANDON"), a United States Citizen, Vapsi MENDEZ ("MENDEZ"), a United States Citizen, and Nora VILLASENOR, ("VILLASENOR"), a United States Citizen, applied for entry into the United States from Mexico through the San Ysidro Port of Entry in vehicle lane 19. BRANDON was the driver and registered owner of a 2010 Infinity G37 ("the vehicle") bearing California license plates. MENDEZ and VILLASENOR were passengers of the vehicle.

16. Canine Enforcement Officer (CEO) M. Jones and his Narcotics & Human Detection Dog (NHDD) "Axel" (#150207) were conducting pre-primary operations when Axel alerted to the vehicle driven by BRANDON. CEO Jones asked BRANDON to turn off the vehicle. CEO Jones questioned BRANDON as to her destination. BRANDON responded they were going to two places, Ontario and Pomona, California. CEO Jones received two negative tow negative Customs declarations from BRANDON. CEO Jones asked BRANDON to open the trunk of the vehicle. BRANDON complied. Axel entered the trunk of the vehicle. CEO Jones received an indication from Axel to the driver side quarter panel of the vehicle. CEO Jones moved the quart panel's factory cover and discovered a package wrapped in cellophane. BRANDON, MENDEZ, and VILLASENOR were escorted to the security office.

17. Customs and Border Protection Officer (CBPO) A. Quevedo was assigned to the SYS POE Vehicle Secondary Lot as a Z-Portal Non-Intrusive Inspection system operator. CBPO Quevedo screened the vehicle with the Z-Portal. CBPO Quevedo examined the Z-Portal images of the vehicle and detected anomalies in the quarter panels and gas tank.

18. CBPO U. Rehmani was assigned to inspect the vehicle. CBPO Rehmani drove the vehicle to the Seized Contraband Coordinator (SCC) garage to begin his inspection. CBPO Rehmani discovered 31 packages hidden inside the gas tanks of the vehicle, with an approximate weight of 14.66 kilograms. CBPO Rehmani discovered

consider information agents may or may not have seen during any examination of the cellphones in determining whether there is probable cause for the requested warrant.

7

two sending consoles inside the gas tanks. CBPO Rehmani discovered 24 packages hidden in the quarter panels of the vehicle, with an approximate weight of 12.14 kilograms. A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.

19. CBPO J. Figueroa conducted a secondary screening of the vehicle. CBPO J. Nguyen noticed additional anomalies in the left and right rear doors in Z-Portal images of the vehicle. CBPO Figueroa discovered five (5) additional packages, with an approximate weight of 2.44 kilograms that field tested positive for the characteristics of methamphetamine. The total approximate weight of all packages discovered within the vehicle after two screenings was 29.24 kilograms (64.46 pounds).

20. I was notified of the event, responded to the San Ysidro POE, and subsequently placed BRANDON, MENDEZ, and VILLASENOR under arrest. I further seized the vehicle, the methamphetamine packages, and the **Target Devices**.

21. BRANDON was advised of her Miranda rights in the English and Spanish languages. BRANDON acknowledged and waived her Miranda rights verbally and in writing. BRANDON provided the following statements in summary:

22. BRANDON stated that on Friday, August 23, 2019, she decided to go to Mexico. BRANDON stated that she is afraid to go to Mexico alone and does not know the Tijuana area well. BRANDON contacted her friend, Nora VILLASENOR about accompanying her. BRANDON stated that on Friday, VILLASENOR agreed to accompany her to Mexico. BRANDON stated that the following morning, Saturday, her daughter, Vapsi MENDEZ, also agreed to accompany them to Mexico. BRANDON stated that on August 24, 2019, at approximately 10:30 AM, BRANDON, MENDEZ and VILLASENOR departed for Mexico. BRANDON stated the group drove directly to the border and made no stops. BRANDON stated they went to a spa in Tijuana where her cousin works to use the bathroom. BRANDON texted a friend, known only to her as "Guero", that they had arrived in Tijuana. BRANDON stated she had known Guero for three to six weeks. BRANDON stated she met Guero at Plaza Rio through her

1 brother, Rafael Orozco. BRANDON stated Guero met them at the spa. BRANDON
2 stated they followed Guero to an unknown car wash where they left her vehicle.
3 BRANDON stated she does not know the name of the car wash, does not know where
4 the car wash is located, and had never been to the car wash before. BRANDON stated
5 that she, Guero, a friend of Guero named "Ricky", MENDEZ, and VILLASENOR went
6 in a white SUV driven by Guero to the beach. BRANDON stated the group ate seafood
7 at the beach, went and listened to music at an unknown restaurant, and went to an
8 unknown night club. BRANDON stated that they had not intended to stay the night, but
9 it got late. BRANDON stated either Guero or Ricky booked an unknown hotel in an
10 unknown location. BRANDON stated they had two rooms. BRANDON stated she
11 stayed in one room with Ricky and MENDEZ and VILLASENOR stayed in the other.
12 BRANDON stated the following day, Sunday, August 25, 2019, she, Guero, Ricky,
13 MENDEZ, and VILLASENOR ate breakfast and drove to Ensenada where they walked
14 around sightseeing. BRANDON stated they rode All-Terrain Vehicles (ATVs) at the
15 sand dunes in Ensenada. BRANDON stated they returned to the car wash around 4:00
16 PM. BRANDON stated they got the car and she drove to the border. BRANDON stated
17 they got a little lost on the way to the border but eventually made it. BRANDON stated
18 they were subsequently arrested at the border. BRANDON denied knowing the
19 narcotics were in the vehicle. BRANDON did not provide an explanation as to how the
20 narcotics could have arrived in the vehicle.

21     23. MENDEZ was advised of her Miranda rights in the English language.
22 MENDEZ acknowledged and waived her Miranda rights verbally and in writing.
23 MENDEZ provided the following statements in summary:

24     24. MENDEZ stated that on Friday, August 23, 2019, she and her mother,
25 BRANDON, decided to go to Mexico. MENDEZ stated that they invited her aunt,
26 VILLASENOR, but she was not going to go. MENDEZ stated that VILLASENOR
27 eventually agreed to go arrived approximately 30 minutes before departure. MENDEZ
28 stated that on Saturday, August 24, 2019, she, BRANDON, and VILLASENOR

departed for Mexico in BRANDON's vehicle. MENDEZ stated the three drove directly to her uncle's clinic in Tijuana. MENDEZ stated a friend of her mother, known only to her as "Guero" arrived at the clinic. MENDEZ stated that Guero drove a Ford Explorer. MENDEZ stated they followed behind Guero in his Ford to an unknown car wash. MENDEZ stated they met Guero's brother at the car wash and all of them left in Guero's Ford. MENDEZ stated they went to Rosarito and ate seafood. MENDEZ stated that after seafood, they went to a club in Tijuana called "Las Pulgas". MENDEZ stated they intended on returning that night, but it got late. MENDEZ stated they decided to get a hotel room at un unknown hotel. MENDEZ stated she shared a room with VILLASENOR while BRANDON stayed in another room. MENDEZ stated that the following day, Sunday, August 25, 2019, they woke and went to breakfast with Guero and his brother. MENDEZ stated that after breakfast, the group went to Ensenada and rode ATVs. MENDEZ stated they returned to the car wash later that day to get the vehicle. MENDEZ stated they had to get directions from Google to return to the border from the car wash. MENDEZ stated they were subsequently arrested at the border. MENDEZ stated that BRANDON had owned the vehicle for the past four to five years. MENDEZ denied knowing the narcotics were in the vehicle.

25. VILLASENOR was advised of her Miranda rights in the English language. VILLASENOR acknowledged and waived her Miranda rights verbally and in writing. VILLASENOR provided the following statements in summary:

26. VILLASENOR stated that she has been to Mexico with her cousin, BRANDON, six to seven times for various beauty treatments at their cousin's clinic in Tijuana. VILLASENOR stated that they normally alternate who drives and which car they drive. VILLASENOR stated that on Tuesday, August 20, 2019, she and BRANDON drove in VILLASENOR's car to Mexico. VILLASENOR stated on that trip she drove to Mexico and BRANDON was the driver on the return trip back to the United States. VILLASENOR stated that on the August 20, 2019, trip to Tijuana she met BRANDON's friends, known only to her as "Jesus" and "Enrique". VILLASENOR

stated that on August 20, 2019, prior to going to lunch, they dropped off her car at an unknown car wash in Tijuana. VILLASENOR stated that the car wash was the same car wash utilized on the Saturday, August 24, 2019, trip to Tijuana.

27. VILLASENOR stated that she and BRANDON decided to go to Mexico on Saturday, August 24, 2019, to have fun and visit BRANDON's friends. VILLASENOR stated that Jesus had been asking BRANDON about her since their meeting the prior Tuesday. VILLASENOR stated that they went to Tijuana around 1-2 PM. VILLASENOR stated they arrived at their cousin's clinic where BRANDON contacted her friend. VILLASENOR stated that BRANDON's friend, Jesus, arrived in a Ford Expedition. VILLASENOR stated that she, BRANDON, and MENDEZ, followed Jesus in his Ford back to the car wash. VILLASENOR stated they left BRANDON's vehicle at the car wash and went with Jesus in his Ford. VILLASENOR stated they went to a gas station and picked up Jesus' brother, Enrique. VILLASENOR stated that she, BRANDON, MENDEZ, Jesus, and Enrique went to the beach to eat. VILLASENOR stated after eating they returned to Tijuana and went to an unknown restaurant with live music. VILLASENOR stated that later they went to a nightclub and met a group of Jesus' family members. VILLASENOR stated that following the nightclub, they went to an unknown hotel and spent the night. VILLASENOR stated Enrique stayed the night at the hotel. VILLASENOR stated the following morning, Sunday, August 25, 2019, Jesus picked them up in his Ford and they all went to breakfast. VILLASENOR stated after breakfast, they went to Ensenada. VILLASENOR stated they went to the sand dunes and rented ATVs. VILLASENOR stated that from the sand dunes, they returned to the car wash in Tijuana. VILLASENOR stated they retrieved BRANDON's vehicle from the car wash and followed Jesus in his Ford back to the main road. VILLASENOR stated they got lost on the way back to the border and had to use GPS to find the clinic and get their bearings. VILLASENOR stated she and BRANDON discussed how someone filled the

gas tank. VILLASENOR stated it was notable that the gas tank was full. VILLASENOR stated they were subsequently arrested crossing the border.

28. On September 4, 2019, a federal grand jury charged BRANDON, MENDEZ, and VILLASENOR with one count of importation of methamphetamine, in violation of 21 U.S.C. §§ 952 and 960.

29. Given the facts surrounding the arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activities of BRANDON, MENDEZ, and VILLASENOR will be found in the **Target Devices**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data, is evidence:

    a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States;

  e. tending to identify the movement of proceeds associated with the trafficking of methamphetamine, or some other federally controlled substance that was imported from Mexico into the United States;

  f. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

  g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

30. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of BRANDON, MENDEZ, and VILLASENOR, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. For the reasons set forth above, I request permission to search the **Target Devices** for items listed in Attachment B for the time period from June 26, 2019, up to and including August 26, 2019, which was the day following the arrest.

## METHODOLOGY

31. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device

13

over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

32. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

33. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

34. Based on all the facts and circumstances described above, there is probable cause to conclude that DEYANIRA VERONICA BRANDON, VAPSI MENDEZ, and NORA VILLASENOR used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

35. Because the **Target Devices** were promptly seized during the investigation of DEYANIRA VERONICA BRANDON's, VAPSI MENDEZ's, and NORA VILLASENOR's trafficking activities and has been securely stored since that time, there is probable cause to believe that evidence of illegal activities committed by DEYANIRA VERONICA BRANDON, VAPSI MENDEZ, and NORA VILLASENOR continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from June 26, 2019, up to and including August 26, 2019.

36. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and to seize items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Whitney Faber
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this ___19___ day of September, 2019.

The Honorable William V. Gallo
United States Magistrate Judge

15

## **ATTACHMENT A-4**

PROPERTY TO BE SEARCHED

The following property is to be searched:

    d. iPhone Cellphone
       IMEI: 354853092738735
       MEID: 35485309273873
       (**Target Device 4**)

The **Target Devices** are currently in the possession of U.S. Customs and Border Protection at the U.S. Customs and Border Protection Permanent Vault at 9495 Customhouse Plaza in San Diego, CA, 92154.

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 26, 2019, up to and including August 26, 2019,:

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;
b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;
c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;
d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;
e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or
f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**